IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALVIN JONES,<br><br>    Plaintiff,<br><br>vs.<br><br><br><br>CAPTAIN MARSHALL, , et al.,<br><br>    Defendants.<br>_____/ | CV F 99 5546 AWI WMW   P<br><br>ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOCUMENTS 84, 94) |

Plaintiff is a state prisoner proceeding pro se. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court is Defendants' motion for summary judgment. Plaintiff has opposed the motion.

Background

This action proceeds on the complaint filed January 21, 1999. Plaintiff, an inmate currently in custody of the California Department of Corrections at Solano State Prison, brings this civil rights action against defendant correctional officials employed at the California State Prison at Corcoran. The alleged conduct that gave rise to this lawsuit occurred at Corcoran State

Prison in January of 1997.[1]

In the amended complaint, Plaintiff alleges the following:

That on January 26, 1997, while housed in the Security Housing Unit (SHU) at Corcoran, defendant Marshall

> underwent an experiment between white racist inmates from a racially segregated unit in the SHU at Corcoran State Prison and with black inmates from another SHU at Corcoran State Prison and informed all of the SHU prisoners that they could not receive their allotted canteen if they did not participate in an integrated yard program on the SHU exercise yard.

Plaintiff alleges that he initially requested to go on the integrated exercise yard on January 26th, but changed his mind when he was informed that his property had arrived from Deuel Vocational Institute (plaintiff was transferred to Corcoran from DVI on December 31, 1996). Plaintiff informed defendants Williams and McCuiston of his desire not go on the yard, as he would miss receiving his personal property. Plaintiff further informed defendants Williams and McCuiston that he did not want to go to the yard because he felt that it was unsafe to participate in the racially integrated SHU exercise yard.

Defendants Williams and McCuiston advised plaintiff that he would be safe on the yard, and that there would not be any white inmates on the yard. Plaintiff alleges that he "decided to accept the word of defendants Williams and McCuiston that his safety would be secured, that there would be other black inmates on the yard and that defendants would protect plaintiff from any kind of physical violence." Plaintiff alleges that after defendants Williams, McCuiston and Marshall had plaintiff in the search area, they prohibited another black inmate from going on the yard. Plaintiff was released to the yard.

Plaintiff further alleges that:

---

[1] On February 12, 2001, Defendants Galaza and Gomez were dismissed. This motion for summary judgment is brought by Defendants Marshall, Balderama, Arzola, Williams and McCuiston.

2

>   While plaintiff was talking to defendant Arezola and requesting to be taken back inside of the SHU based upon the fact that no other African American prisoners were on the yard with him and only two known white racist inmates that was passing back and forth, just waiting to attack plaintiff.  As the attack happened plaintiff was hit in his head, ear, jaw and mouth by the two white racist inmates that defendants and each of them authorized to be placed on the racially segregated SHU yard from the approved memorandum of defendant Gomez.

Plaintiff further alleges that he was "fired upon" by defendant Arezola.

Plaintiff alleges that he was then "medically inspected" by a Medical Technical Assistant, who examined plaintiff inside a holding cage, and who "refused to allow plaintiff to be medically examined by a Medical Doctor for the injuries he received which consisted of a fractured jaw, a blow to his ear, a chipped tooth and a swollen head from the attack on his person by inmates . . ." Plaintiff specifically alleges that, on January 26, 1997, he requested permission to see a physician and was denied permission by defendant MTA Balderama.  Plaintiff alleges that he was eventually seen by a physician on February 3, 1997, a John Doe Medical Doctor.

Defendants submit the following undisputed facts.[2]

1. The incident underlying this lawsuit occurred on January 26, 1997. 30:8.  That day, while he was in his cell, staff asked the inmates how many people wanted to go to the yard that day, and plaintiff said he wanted to go. 30:17-21.  However, plaintiff did not have to go to yard that day, just as every inmate has the choice to go or not, if they have had yard privileges. 31:1-16.  Plaintiff first knew he was going to yard that day early in the morning when the inmates decide if they want to go.  The choice is the inmate's, not the correctional officers'. 159:22-160:7; 160:19-22.

2. James Mitchell was the other inmate present with plaintiff in the cage when they were being processed onto the yard, but other officers besides Williams and McCuiston

---

[2] Unless otherwise stated, all subsequent references are to page:line of plaintiff's April 12, 2002, deposition transcript, a true, complete and correct copy of which has been submitted as an exhibit in support of defendants' motion for summary judgment.

were coming and going.  39:15-20.

   3.  The procedure was for inmates, by race, to be taken out separately to a tank. Then they were put into a holding tank, where plaintiff was stripped, went through the regular process that inmates go through, including a strip search, cavity (including mouth) search, and a wand (metal detector) search for any weapons on the inmates' person or in their clothes.  31:10-32:9.

   4.  Plaintiff could not remember which yard he went to, nor which cell he was housed in that day, though he was double-celled.  46:8-14.  Before plaintiff went onto the yard, he noticed Mitchell wasn't coming onto the yard with him because Mitchell was told he would have to take the braids out of his hair.  46:21-47.

   5.  Plaintiff did not remember if any other inmates were in the cell with him and Mitchell, but he did see other inmates being searched, though he doesn't know their names or how many he saw searched.  48:1-9.  Plaintiff did not remember the races of those he saw searched because he "really wasn't paying any attention to their race."  48:10-22.  Plaintiff observed other inmates put back into their holding cells prior to going to yard that day.  55:21-56:6.

   6.  Plaintiff admitted he had no way of knowing if he and Mitchell were the only two Black inmates who would be on the yard that day, because they don't know which yard they are going to on a particular day.  53:4-18.  Plaintiff claimed he asked and was told that there were other Black inmates on the yard that he was going to, so he understood that there would be other Black inmates on the yard with him.  53:18-23.  Plaintiff was unsure of the sequence of events leading to his going on the yard.  58:16.

   7.  Since plaintiff arrived at Corcoran on December 31, 1996, he had been there less than a month before the incident complained of.  Plaintiff had only been on the yard 1 or 2 times during this period, and can't recall either date.  64:15-25.  Plaintiff was aware of times,

and had himself been on the yard, when Blacks and Whites were there together and no fights occurred. This might have occurred one or two times. 68:15-25. Of the two prior times plaintiff had been on the yard, on at least one of these occasions, other Black inmates were present with him and no assaults occurred. 69:16-71:6; 72:7-8.

8. CDC's SHU program policy is what plaintiff refers to as an "experiment" in the complaint. 17:22-24; Cmp. at p. 3, ¶ IV. Plaintiff admits that he does not know of the CDC policy he referred to as "an experiment," but he claims he saw a memo about integrated SHU yard programs sometime in January 1997 that allegedly provided that inmates, including plaintiff, could not get "a lot" of canteen privileges unless they participated in an integrated yard. 18:1-22; Cmp., pp. 3. Plaintiff claimed the memo was posted in the room just before the sally port to the yard. 20:5; 24:2-3. Plaintiff "thinks" he saw the memo before he was injured, but can not state when. 20:6-16. Plaintiff never discussed the memo with any other inmates or staff. 20:17-22. Plaintiff "got the opinion" that the policy or "experiment" was going to be implemented, but did not know it was going to be. 21:4-8; 22:3-5. Plaintiff claimed to have seen the memo before the day he was attacked, but can't remember if he saw it before going to yard on the two earlier occasions. Plaintiff claimed he read the memo when it was on the wall, but he never took the copy of the memo he saw down from the wall to read, never asked for a copy of it, never was given a copy of it by anyone else, and cannot remember if the memo had a date on it. 153:8-20.

9. Once on the yard, plaintiff saw two White inmates pacing back and forth. Plaintiff claimed he then turned around and faced the gunner and asked to be taken back before he was "hit upside the head and different places." 59:16-25; 61:11-13. Plaintiff felt a blow land on his right cheek area, and there were others, but he can't describe their number and doesn't "know what all happened after that." 81:1-4. Plaintiff was also hit in the side and claims his front tooth was chipped, which he also claims the dentist at Corcoran filed down "probably"

six months after the incident. 91:8-20. Plaintiff felt like he "was hit all over," but doesn't know how many people hit him, how many times he was hit or who did the actual hitting, though he saw both White inmates when he turned and tried to protect himself. 81:23-82:9. Plaintiff did not recall hearing the two White inmates say anything as they assaulted him and did not see them with any weapons. 83:13-25. Plaintiff states that "they just jumped on me." 84:10-16.

  10. Plaintiff heard what sounded like a gunshot and "was hit," and heard other noises like shots, and people hollering to get down and so they all got down. 84:22-85:1. Plaintiff knew that guards' use of the term "get down" means to do that or get shot. 85:6-10. Plaintiff had pain all over and was black and blue on his right side and on his neck. Plaintiff also suffered a swollen eye. 86:7-25. Plaintiff thought he was struck by a block gun, because he felt a hit that hurt just a little bit more than the fists, but admits that he has no way of knowing if this was a hit from a gun or from one of the two White inmates, and admitted that he was never hit with a bullet. 87:8-88:3.

  11. MTA Balderama examined Jones in a holding cell and told the C/Os to take him back to the cell. 98:24-99:1. Plaintiff asked to see a doctor, and Balderama told him to fill out a form, which plaintiff admits is standard procedure, and he saw a doctor within 6-7 days. He claimed he never saw Balderama again and sued her because he felt she did not treat him properly; that he should have been able to see a doctor. 105:5-106:25.

  12. Plaintiff next saw Mitchell the same day or the next. His cell was 3-4 cells away from plaintiff's and they were able to pass kites to and from each other. One of the kites passed between these two relating to this incident is Exhibit B to the complaint, which plaintiff asked Mitchell to write for him. 110:11-112:16.

  13. Plaintiff doesn't quite remember which doctor he saw or when he saw him in response to his request for one, but admits that his medical records are the best evidence of his complaints and their treatment with one exception; When plaintiff was seen by this doctor, he

1 claimed his chart wasn't there, although this did not prevent the doctor from examining him and
2 telling him that he was fine. 120:3-121;12. Plaintiff also admits that the doctor was in the best
3 position to know his condition because he is the doctor. 212:13-22.

4     14. Before arriving at Corcoran, plaintiff knew what an enemies' list was but did
5 not list anyone at Corcoran as an enemy, even though he recognized that gang membership was
6 irrelevant to being named on one. 125:1-24. Plaintiff never made an enemies' list after the
7 incident either, including the names of his two assailants, since he logically assumed that the
8 prison administration would put their names on an enemies' list, which they did. 126:1-12; Ex.
9 G to German Decl.

10     15. Captain Marshall was not present during any of the altercation and plaintiff
11 does not know where he was that day. 128:1-5. Plaintiff has no facts to support his belief that
12 Marshall wanted something to happen to him. 145:23-146:9.

13     16. Based on plaintiff's experience on general population yards, it is the inmates
14 who exclusively choose with whom they associate, based primarily on racial grounds. 151:18-
15 25. This is not CDC policy, but an inmate-driven choice, and plaintiff is not aware of any such
16 CDC policy. 152:-1-11.

17     17. Plaintiff learned his two attackers had been disciplined, but he felt they
18 should have been criminally prosecuted.158:18 - 159:14.

19     18. Plaintiff was 6'5" and weighed about 220 lbs. on the date of the incident.
20 Plaintiff was working out regularly doing pushups and aerobics and "things like that." 162:4-25.
21 He was "in pretty good shape." 163:2.

22     19. Plaintiff knew of no specific incidents or facts to support his allegation that
23 Williams and McCuiston knew that Whites had threatened violence against Blacks if integration
24 was attempted on the yard. 161:14-18.

25     20. Plaintiff has no physical facts to support his conspiracy claim, just "the fact
26

1  that they knew if I went to that yard something was going to happen." 171:18-21.  Before the
2  incident occurred, plaintiff "had no reason to even think" defendants would do anything to harm
3  him. 173:3-4.  Plaintiff drew his inference of a conspiracy from what he observed defendants do
4  only on the day he was attacked.  173:9-21.

## Failure To Protect

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  Farmer v. Brennan, 511 U.S. 825, 833 (1994).  The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation when: (1) the deprivation alleged is "objectively, sufficiently serious" and (2) the prison officials had "a sufficiently culpable state of mind," acting with deliberate indifference. Farmer, 511 U.S. at 834.  "[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. At 835.   The prison official must "know and disregard an excessive risk to inmate health or safety."

In applying the deliberate indifference standard, the trier of fact "must consider whether, in allegedly exposing the prisoner to danger, the defendant prison official(s) were guided by considerations of safety to other inmates . . . More generally, the legal standard must not be applied to an idealized vision of prison life, but to the prison as it exists, and as prison official(s) are realistically capable of influencing." Berg.v. Kincheloe, 794 F.2d 457, 462 (9th Cir. 1986).

In order to meet their burden on summary judgment, Defendants must come forward with evidence that establishes the lack of existence of a triable issue of fact - evidence that no Defendant knew of the specific harm to Plaintiff, and acted with deliberate indifference to that harm.  Defendants must come forward with evidence that there was no objective basis for them to know that Plaintiff would be attacked when released to the yard.

Throughout his deposition, Plaintiff fails to identify any objective basis from which any

of the Defendants could infer that Plaintiff was in danger of assault.  When Plaintiff was first notified that he was going to the yard, he advised "them" that he did not want to go to the yard. Plaintiff was advised that if he did not go, he would not get his property.   Plaintiff was told that he was going to the yard.  Plaintiff responded that "it was raining and I didn't  want to go to the yard.  Then I informed them that I didn't want to go to the yard because I felt it was going to be an incident and that my life was in jeopardy if I went to the yard." (Pltf.'s Dep., 41:5-9).    This conversation occurred in the strip search area, prior to the search.  Id. at 44:34.

Once Plaintiff discovered that inmate Mitchell was not going to the yard, he again objected.   Plaintiff indicates that he had already objected about going onto the yard because he wanted to get his property. Id. at 47:15.    Though Plaintiff became concerned because inmate Mitchell was not coming onto the yard with him, he did not identify to any of the officers present any specific danger to him.

> A.  Well, he was coming with me, but Mr. Mitchell was informed at that point that he would have to take the braids out of his hair.  At that point again I requested that I did not want to go onto the yard.  I was assured that I would be safe on the yard.  That there was other black inmates on the yard so – now, I don't know if this – all this conversation happened right at the breeze way or did it happen during the time I was in the cell complaining about not going, but all of this happened.  I can't remember exactly if it was here or – or in– but I had the conversation, and once I found out that Mr. Mitchell wasn't coming with me, I again objected going to the yard.
>
> Q.  You objected again going to the yard?
>
> A.  Yes.
>
> Q.  Okay.  But when you found out that Mr. Mitchell wasn't going to the yard with you, you had already objected about going onto the yard because you wanted to get your property: Is that correct?
>
> A.  True, True.
>
> Q.  Okay.  You mentioned you were back in a cell.  Once you were searched, were you then put back into a holding cell before you went out onto the yard?

1   A. Yes.

2   Q. Were you and Mr. Mitchell searched together?

3   A. Yes.

4   Q. Was there anyone else in the cell with you?

5   A. I don't remember.

6   Q. Do you remember seeing other inmates being searched?

7   A. I do.

8   Q. Who did you see being searched?

9   A. I don't remember.  I don't know.

10  Q. Do you know how many people you observed being searched?

11  A.  No.

12  Q. Do you remember whether you saw any white inmates being searched?

13  

14  A. I don't recall.

15  Q. Did you see any black inmates being searched?

16  A. I can't recall.

17  Q. How about others?

18  A. Mexicans?

19  Q. Yeah, Hispanics, American Indians, others.  Asians.

20  A. I don't remember the race of any.  You know.  I really wasn't paying attention.

21  Q. To the race?

22  A. To the race.

23  Q. How long had you been in the holding cell until you started to go out onto the yard?

24  

25  A. I can't really say for sure.

26  Q. But again you do recall a period of time elapsing?

1       A. Yes, I do.

2       Q. Can you give me an estimate of how long it was?

3       A. I would say ten, 15 minutes.

Id. at 46:21-50:5.

When specifically asked if he knew what Mitchell's reasons were for declining to go on to the yard, and what his reasons were, Plaintiff responded as follows.

    Q. Okay. But he did not want to go to the yard either: Correct?

    A. He changes his mind, too.

    Q. Before. And the reason for that was because you say you were the only two black inmates that day?

    A. His exact reasons why he didn't want to go –

    Q. Right.

    A. – I can't tell you.

    Q. What were yours?

    A. Mine was I wanted to get my property. My main reason is I wanted my property. Then after that it became – it became aware to me that it might be more to this. I had an intuition or a feeling that something else might happen.

    Q. What was the feeling that you had?

    A. That for some reason the people were just insisting on me going to the yard, us going to the yard for some reason.

Id. at 51:13-52:8. Plaintiff provides no specificity as to the danger that he felt he was in. Further, Plaintiff fails to identify any particular danger that he was objectively aware of prior to going onto the yard. Plaintiff continues:

    Q. You testified earlier that you and Mr. Mitchell were the only two blacks who were going to the yard that day. Correct?

    A. Yes.

11

1  Q. Okay. How did you know that?

2  A. Because when – in our unit – I shouldn't say to the yard, because there is other units that come to the yard. What I meant by black inmates – we got to talk about just the unit I was in. Me and Mr. Mitchell was the only two that came out to go.

Q. Did you see any of the other inmates in your unit come out and go to the yard?

A. No, because they would have come out at the same time.

Q. So you didn't see anyone going to the yard out of your unit but for you and Mr. Mitchell?

A. Yes. Out of our unit.

Q. Did you see inmates from other units about to go into your yard?

A. I can't see that.

Q. So you would have no way then of determining whether or not you or Mr. Mitchell were the only two black inmates who would be on your yard that day: Correct?

A. On that yard, particular yard that we were going on?

Q. Yes.

Id. at -52:8 53:10.

Plaintiff further testifies that inmates from other units are taken to the holding cells, which lead to different yards. Whatever door the guard opens determines what yard the particular inmate goes to. There was therefore no way Plaintiff could have known what yard he was going to, who was going to be on that yard, or how many inmates there would be. Id. at 55:5.

The only time that Plaintiff specifically requested to be taken off the yard was after he was released on to the yard. Plaintiff, responding to his "gut" feeling, told the gunner that he would like to be returned to his cell, and that he "didn't want to go through with what I felt was about to happen." At that point, Plaintiff was attacked by two inmates, and the gunner responded

12

1   by ordering all the inmates down.  Plaintiff does not dispute that the gunner responded
2   immediately to the altercation.  Id. at 88:10.
3       The court finds that, as to the specific harm to Plaintiff, Defendants have met their burden
4   on summary judgment.  The evidence is clear that Plaintiff had a subjective fear of harm, and that
5   he had a "gut feeling" that something was going to happen to him.  Despite opportunities in his
6   deposition to identify a specific, objective harm to Plaintiff, there is no evidence that any of the
7   defendants in this action knew of any specific danger to Plaintiff.  Plaintiff had been at Corcoran
8   less than a month when the attack occurred.  Id. at 129:9-15.
9       The court finds that defendants have met their burden on summary judgment.  There is no
10  evidence that any of the defendants had a sufficiently culpable state of mind.  There is no
11  evidence that defendants could have inferred or otherwise known that the inmates who attacked
12  Plaintiff posed a substantial risk of harm to Plaintiff.
13      In his opposition, Plaintiff restates his contention that he was in fear, but offers no
14  evidence that any of the defendants knew, or should have known, of the specific harm to
15  Plaintiff.  The evidence shows, at most, that Plaintiff had a generalized fear for his safety, but
16  offers no evidence that defendants knew of the specific harm to Plaintiff.   There is no evidence
17  that Plaintiff had known enemies at Corcoran, and no evidence that the individuals who attacked
18  Plaintiff were known enemies.  Summary judgment will be granted on Plaintiff's failure to
19  protect claim.

Medical Care

21      In the complaint, Plaintiff alleges that defendant Medical Technical Assistant (MTA)
22  Balderama refused plaintiff's request to see a physician, despite the fact that he had been beaten
23  and shot.  Plaintiff also alleges that, on the date of the incident, after he had been seen by
24  Balderama, defendants "intentionally prevented plaintiff from being medically examined and X-
25  rayed for the injuries that he sustained during the vicious attack. . ."  Plaintiff alleges that
26

defendants prevented him from medical treatment in order to cover up the evidence of plaintiff's injuries.

In his deposition, Plaintiff indicates that he was seen by a physician "six or eight days" after the incident. Id. at 124: 25. The complaint names as a defendant MTA Balderama. Plaintiff was seen by MTA Balderama shortly after the incident. Id. at 100:14. Balderama looked at Plaintiff from outside of the holding cell, but did not physically touch Plaintiff. Plaintiff's claim is that Balderama's failure to physically examine him constitutes deliberate indifference.

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). The "deliberate indifference" standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, the prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm. Farmer v. Brennan, 511 U.S. at 837. A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Id.

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105-06. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the

victim is a prisoner." Estelle v. Gamble, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995); McGuckin v. Smith, 974 F.2d 1050, 1050 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997)(en banc). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). A prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

In order to meet her burden on summary judgment, MTA Balderama must come forward with evidence that establishes the lack of existence of a triable issue of fact - evidence that she did no know of and disregard a serious risk to Plaintiff's health or safety, resulting in injury to Plaintiff.   The entire interaction with Balderama and Plaintiff is set forth in Plaintiff's deposition:

> Q. Do you recall being the first one to be taken off the yard?
>
> A. I can't remember.
>
> Q. And then what happened?
>
> A. Then I was put in this holding cell and the MTA came and observed me and told them to take me back to the cell.
>
> Q. Let's stop there and explore what happened along that way. You told me about the injuries you had.  Is it a fair statement to say that they were predominantly to your right side?
>
> A. No.  I felt they were all over my body.
>
> Q. That's fine.
>
> A. Yeah, I was hurt.
>
> Q. Were you bleeding at all?
>
> A. I think so.
>
> Q. Do you know where you were bleeding from?
>
> A. I think from my mouth.

15

1  Q. Did you have any other oral injuries other than the chipped tooth?

2  A. No.

3  Q. Okay. Did you have any broken bones as a result of this altercation?

4  

5  A. Not to my knowledge.

6  Q. Okay. You were taken off the yard in handcuffs?

7  A. Yes.

8  Q. Did you get up from your prone position all by yourself or did you have to be helped?

9  

10 A. I think they helped me up.

11 Q. Okay. At that time was it more than one guard who helped you?

12 A. I can't remember how many it was. I just can't remember that.

13 Q. Okay. You were taken back to the holding cell from the yard through the little room that leads into the yard?

14 

15 A. Right.

16 Q. How long were you in the holding cell before the MTA came?

17 A. I think the MTA might have been there when I was taken to the room.

18 Q. So she was waiting for you?

19 A. I don't know. I really didn't pay any attention.

20 Q. Is it a fair statement to describe it that she was there quickly?

21 A. Quickly, yes.

22 Q. Good. And did she examine you?

23 A. Did she ask any questions?

24 Q. I'm sorry?

25 A. Did she ask me questions you mean?

26

16

1  Q. Did she look at you, feel you, inspect you, ask questions? Anything that would constitute a medical examination.

2  
3  A. She looked at me and questioned me.

4  Q. Asked you questions?

5  A. Yeah.

6  Q. And that's it? Do you recall what the questions she asked you were?

7  A. No, not offhand.

8  Q. Did she touch you?

9  A. No.

10 Q. She didn't, for instance, touch parts of your head and ask you if it hurt?

11 
12 A. No.

13 Q. Do you know what palpation is?

14 A. No. What's that?

15 Q. I will represent to you that palpation is one touching, palpable as in something you put your hands, fingers on. Did she do any palpation on you?

16 
17 A. No. I was in a cell. She was outside the cell.

18 Q. Oh, I misunderstood. I thought she was in the cell with you.

19 A. They don't allow them, I think, to come in the cell with you.

20 Q. Okay. What were your complaints at that time? What did you tell her?

21 A. I told her my head, that I had a swollen head. My jaw feel like it was broke and teeth bleeding. My back, side was hurting. I had pains.

22 
23 Q. Okay. But you subsequently did discover that you fortunately had no broken bones: correct?

24 
25 A. Yes.

26 Q. And your tooth was treated within six months?

1    A. I don't know about treated.

2    Q. The did something to it, correct?

3    A. They filed it down.

4 Ptf.'s Dep. at 98:20-102:6.

5    Here, the evidence establishes that Balderama observed Plaintiff immediately after the incident. Balderama looked at Plaintiff and asked Plaintiff questions. Plaintiff suffered pain, and was eventually treated by the dentist. That MTA Balderama did not physically examine Plaintiff does not, of itself, subject her to liability. There is no evidence that Plaintiff suffered further injury as a result of Balderama's conduct. There is no evidence that Balderama knew of a serious condition, and failed to treat it. Plaintiff's subsequent medical care, or any lack of subsequent medical care, is not at issue here. The only conduct at issue is Balderama's conduct immediately after the altercation. There is no evidence that Balderama's conduct caused Plaintiff injury. At most, the evidence establishes that Balderama may have acted unreasonably in failing to touch Plaintiff, but, as noted, negligence, even gross negligence, does not satisfy the constitutional standard. Further, Plaintiff, in his deposition, indicates that it is his belief that Balderama was not allowed to enter the holding cell. There is no dispute that MTA Balderama failed to touch Plaintiff or treat Plaintiff at the scene. There is no evidence, however, that Balderama's conduct caused Plaintiff further injury. In his opposition, Plaintiff offers no such evidence. Judgment will therefore be entered for MTA Balderama on this claim.

### Conspiracy

In the context of conspiracy claims brought pursuant to section 1983, such a complaint must "allege [some] facts to support the existence of a conspiracy among the defendants." Buckey v. County of Los Angeles, 968 F.2d 791, 794 (9th Cir. 1992); Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621, 626 (9th Cir. 1988). Plaintiff must show that defendants conspired or acted jointly in concert and that some overt act was done in furtherance

1  of the conspiracy.  Sykes v. State of California, 497 F.2d 197, 200 (9th Cir. 1974).

2        As noted in the Eighth Amendment analysis, the evidence indicates that Defendants did
3  not know of a specific harm to Plaintiff.  Plaintiff had no known enemies, and Plaintiff failed to
4  articulate to any of the named defendants any specific danger to him.  That Plaintiff is African
5  American and the other inmates are not does not, of itself, subject Defendants to liability for a
6  conspiracy to violate Plaintiff's civil rights.   The evidence submitted by defendants indicates that
7  Plaintiff's fears was based upon his own subjective feelings.  Plaintiff had only been housed at
8  Corcoran for less than a month, he had no known enemies, and there is no evidence that any of
9  the defendants knew of a particular danger to Plaintiff.

10        In his opposition, Plaintiff submits copies of media reports regarding investigations
11  conducted at CSP Corcoran by various agencies, as well as a copy of a memorandum from the
12  Director of the California Department of Corrections to the wardens regarding the investigations.
13  Neither of these documents offers any evidence that any of the defendants in this case knew of a
14  particular harm to Plaintiff.

15        Further, Plaintiff's Exhibit A to his opposition, page 3, is a copy of the Second Level
16  Appeal Response to inmate grievance no. 97-3181.  This grievance challenges Plaintiff's
17  placement on an integrated yard.  The response, in part, follows.

> Your allegations that you were shot with a rifle is a false statement.
> The aforementioned is based on the fact that no fire arms were
> discharged as a result of this incident.  You were not forced to go
> to yard as per procedure.  You were released upon your request to
> participate in the yard activities.  You could have easily refused to
> go to yard and that information would have been documented.
> Your allegations that you were hand picked to participate on an
> integrated yard is another inaccurate statement.  Records reflect
> that you appeared before Unit Classification Committee (UCC) on
> 1-16-97 and reported that you had no known enemies on your tier
> and expressed a willingness to program on the mixed yard.
> Therefore, UCC elected to approve you for mixed yard
> designation.

25        That Plaintiff was attacked by inmates of a different race does not, of itself, subject the

defendants to liability for conspiracy to violate his civil rights.  Plaintiff must come forward with evidence that defendants knew that he was in particular danger.  Plaintiff offers no evidence that any of the named defendants knew of a particular harm to Plaintiff.  Judgment should therefore be entered for defendants on this claim.

Because Plaintiff has failed to offer evidence of a triable issue of facts, defendants' motion for summary judgment should be granted. .  Plaintiff's motion for summary judgment should therefore be denied on the same ground.  Because there is no evidence of a triable issue of fact, Plaintiff is not entitled to judgment in his favor.  Further, Plaintiff's motion for summary judgment consists of six pages of legal argument.  Plaintiff offers no evidence in support of his motion.

Accordingly, IT IS HEREBY ORDERED that defendants' motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.  Judgment to be entered in favor of defendants and against Plaintiff.

IT IS SO ORDERED.

**Dated:   September 27, 2006**          _____/s/ Anthony W. Ishii_____
9h0d30                                                            UNITED STATES DISTRICT JUDGE